# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

Curtis Pronk,

        Plaintiff,

    v.

                                      **MEMORANDUM OF**
                                      **LAW AND ORDER**
                                      Civil File No. 22-3090 (MJD/SGE)

City of Rochester; Erik Kerska,
individually and in his official capacity;
Vance Swisher, individually and in his
official capacity; and Linda Hillenbrand,
individually and in her official capacity,

        Defendants.

Stephen C. Fiebiger, Stephen C. Fiebiger Law Office, Counsel for Plaintiff.

Andrew A. Wolf and Susan M. Tindal, Iverson Reuvers Condon, Counsel for Defendant.

## I.  INTRODUCTION

This lawsuit arises from an employment dispute between Plaintiff Curtis Pronk and Defendants City of Rochester, Erik Kerska, Vance Swisher, and Linda Hillenbrand.  Before the Court is Defendants' Motion for Summary Judgment (Doc. 48).  For the reasons stated below, the Court grants the motion in its entirety.

## II.    BACKGROUND

### A.    Pronk's Background

Curtis Pronk earned his bachelor's degree in business administration in 1983 and his master's degree in business operations in 2003.  (Pronk Dep. 11:14-22:05, 19:10-21; Pronk C.V.)  For approximately 23 years, Pronk worked in various roles in the insurance industry, including as a supervisor to several employees.  (Pronk Dep. 16:16-17:18.)

### B.    The Rochester Fire Department

In 2006, the City of Rochester ("the City") hired Pronk to serve as the Administrative Service Manager ("ASM") for the Rochester Fire Department ("RFD").  (Pronk Dep. 20:17-22:06.)  His responsibilities primarily included budgeting, facilities management, and finance payments, but no supervisory responsibilities. (Id. 22:11-23:08.)  The lack of supervisory responsibilities meant that he belonged to the Rochester Professional Employees Association ("RPEA"), the union for non-supervisors. (Hillenbrand Dep., 61:19-25.)

Battalion Chief Erik Kerska and Fire Marshal Vance Swisher worked with Pronk when he first began at the RFD.  (See Swisher Dep. 19:13-20:03; Kerska Dep. 10:06-15.)  According to the RFD's hierarchy structure at the time, as a battalion fire chief, Kerska ranked below Pronk.  (See Swisher Dep. 43:04-25; 2009

2

RFD Org. Chart.)   As a fire marshal, Swisher ranked equally to Pronk.  (See

Swisher Dep. 43:04-25; 2009 RFD Org. Chart.)

The three became friends and often ate lunch, worked out, or went on

walks together.  (Swisher Dep. 19:13-20:03; Kerska Dep. 10:06-15; Pronk Dep.

57:11-58:12.)  Their socializing usually happened at work but there were some

instances outside of work as well.  (Swisher Dep. 19:22-23.)  For example, Pronk

and Kerska once ran into each other at a restaurant and decided to eat dinner

together.  (Kerska Dep. 10:06-15.)  Pronk also attended Kerska's army retirement

party in 2015.  (Id.)  As part of their friendship, Kerska and Pronk called each

other "Richard" to jokingly refer to each other as a "dick" or a "jerk."[1]  (Kerska

Dep. 124:04-25; Swisher Dep. 39:02-18.)

### C.    Pronk's 2011-2017 Performance Reviews

Around 2011, the City promoted Swisher to deputy fire chief.  With this

promotion, Swisher became Pronk's direct supervisor, and he provided Pronk

---

[1] Another example of this inside joke was a 2016 incident where Pronk ordered
an employee that he was supervising to bake a penis-shaped cake for Kerska's
birthday and presented it to Kerska at a celebration in front of co-workers.
(Kerska Dep. 123:15-124:03; Swisher Dep. 39:21-40:03.)  When the cake was
presented to him, Kerska felt it was a "very uncomfortable moment" and he
"quickly put the lid back on so nobody would hopefully see it."  (Kerska Dep.
124:01-03.)

his annual reviews.  (Swisher Dep. 20:17-21:03.)  Swisher's promotion brought

him and Pronk closer together as they met nearly daily to discuss work and other

things going on in their lives.  (Pronk Dep. 57:09-58:12.)

Annual reviews were provided around an employee's work anniversary

and typically covered the time from the previous anniversary to the next

anniversary.  (Swisher Dep. 20:17-21:03.)  For example, Pronk's 2011 Annual

Review evaluated his performance from February 16, 2010, through February 16,

2011.  (See Docs. 68-69.)  In general, from 2011-2017, Pronk received successful

reviews from Swisher, and was highly commended for his performance as the

ASM. (Id.; 68-70; 68-71; 68-72; 68-73; 68-74; 68-75.)

### D.    Pronk's Supervisory Responsibilities

Although not part of his job description, Pronk assumed supervisory

responsibilities during his time at RFD. (Pronk Dep. 57:09-58:12.)  First, Pronk

supervised the department mechanic from 2011 through 2015.  (Id.)  Then he

supervised the accounting clerk from 2015 through 2017.  (Id.)  When he became

a supervisor, Pronk moved from the RPEA to the Rochester Supervisory

Association ("RSA"), the union for supervisors.  (Doc. 62-6.)  When these

responsibilities ended in 2017, his union changed back to the RPEA.  (Doc. 62-10.)

### E.    Reorganization within the RFD

Around 2018, the RFD reorganized.  As one of the changes, Deputy Chief Belau became Pronk's direct supervisor.  (Kerska Dep. 11:17-12:17.)  Belau wrote Pronk's 2018 Annual Review, but he retired before he provided it to Pronk.  (Id. 34:01-36:24.)

Around June 2018, the City promoted Kerska to Fire Chief and he became responsible for overseeing the entire RFD.  (Id. 11:17-12:17.)  With this promotion, Kerska succeeded Belau as Pronk's direct supervisor.  (Id.)  Around the same time, Pronk began supervising the administrative assistants, and he moved back to the RSA.  (Pronk Dep. 65:22-25.)

Around March 14, 2019, Kerska provided Pronk with both his 2018 and 2019 Annual Reviews.  (Doc. 68-54.)  Both reviews rated Pronk as successful.  (Id.)  In May of 2019, Swisher again became Pronk's supervisor. (Doc. 68-53 at 3.)

### F.    Strategic Planning by Kerska

In his new role, Kerska wanted to improve the RFD and immediately began a "full-blown strategic plan analysis" of the organization.  (Kerska Dep. 12:23.)  Pronk helped and provided a list of the tasks conducted by the administration department.  (Id. 12:11-17:09; Pronk Dep. 25:17-27:10; Doc 68-2.)  He also indicated to Kerska that the department needed an additional

5

administrative assistant to manage its workload.  (Kerska Dep. 16:11-17:07.)

Kerska presented the strategic plan to the city council in September 2019, which

city council ratified in October 2019.  (Id. 14:02-4.)   The city council, however,

did not approve of adding a new administrative assistant.  (Id.  23:22-25.)

Because of this, Kerska wanted to conduct a "deep analysis" of the department to

better understand its needs. (Id. 69:09-11.)

### G.     Evaluation of the Administration Department

In March 2020, the COVID-19 Pandemic lockdowns delayed any further

restructuring of the RFD.  (Id. 69:08-11.)  Kerska revisited his plans later that year

and tasked Swisher with providing an overview and a detailed analysis of the

department.  (Id. 27:07-10; Doc. 68-3.)  The two agreed that any restructuring

would be completed by mid-2021.  (Kerska Dep. 99:9-12; Swisher Dep. 137:19-25.)

When Swisher began this analysis, issues arose between the staff.  (Swisher

Dep. 28:16-30:16).  The administrative assistants felt that Pronk "was not

overseeing their workload" and was not ensuring an even distribution of their

work.  (Id.)  Swisher's evaluation of the department revealed that Pronk failed to

perform certain ASM responsibilities or performed them insufficiently.  (Swisher

Dep. 30:25-32:10, 51:13-19; Kerska Dep. 26:11-32:10, 59:08-63:18, 83:20-84:02,

99:06-100:03.; see also Doc 68-57.)  Swisher heard concerns from other RFD

6

employees regarding Pronk's management of the budget, fleet maintenance,

facilities maintenance, and IT issues.  (Swisher Dep. 31:07-20.)  Swisher spoke to

Kerska, who directed him to candidly discuss the concerns with Pronk during his

annual review. (Swisher Aff. ¶ 7, Doc. 52.)

### 1.     Pronk's 2020 Annual Review

In December 2020, Swisher gave Pronk his 2020 Annual Review. (Doc. 68-5

at 8.)  In part, the review provided the following:

> [Pronk] needs to become more proactive in his position and
> anticipate the needs of the organization and bring this information
> forward to Command Staff. Examples of opportunities for [Pronk]
> include: regular budget review and forecasting, facility inspections
> and CIP planning, identifying alternative funding opportunities
> (grants).

(Id. at 5.)  Additionally, Swisher wrote that:

> [Pronk] should become more involved with his team on a daily basis
> and work to gain a better understanding of the task[s] they perform
> and the workload they are assigned as there is an appearance of an
> uneven distribution of task[s] among his team members. One of his
> team members is assigned to support the EOC, however it does not
> appear that [Pronk] understand[s] the task[s] or [workload] that is
> placed on this team member.  [Pronk] needs to move from a
> management orientation to a leadership orientation for this team,
> focusing on developing the team through this staff and not just
> managing their tasks.
>
> The appropriate supervision of this team is being evaluated during
> the Fire Administration review. This review will be completed prior
> to the completion of [Pronk]'s next performance review cycle.

(Id. at 6.)  Overall, the 2020 Annual Review rated Pronk's performance as successful.  (Id.)  While Pronk received a successful review, Swisher testified that he only did this so that Pronk could still receive his merit increase for the year. (Swisher Dep. 61:05-62:03.)

### 2.    Pronk's 2020 Alternative Review

Swisher also gave Pronk an alternative 2020 review.  (Doc. 68-9 at 2.)  The purpose of the Alternate 2020 Review ("the alternate review") was to ensure that Pronk had "a clear understanding of how he [was] perceived by peers and subordinates, the quality of his work product, and his performance as it related to his position within the organization."  (Id. at 3.)  The alternate review states:

> [Pronk] is well like[d] by his peers, but is not respected as a member of the Fire Department Team who contributes at a level appropriate for his position. The perceptions that contribute to Curt not being respected [are] noted within the Fire Department and our supporting Departments such as Finance, Human Resources, Etc.

(Id.)  The alternative review went on to discuss "[e]xamples of these perceptions and themes" in detail.  (Id.)  The primary criticisms that Swisher provides are: (1) "[Pronk] is not perceived as a teammate that has initiative to step up and help the team when needed," (2) "[Pronk] is not perceived as having an understanding of how his job fits into the organization or the administrative

functions and task[s] that are under his direction or occur within Fire

Administration" and (3) "[Pronk] is not perceived as having the ability or desire

to lead the Fire Administration."  (Id. at 3-5.)

### H.    Reorganization of the Administration Department

#### 1.    Decision to Reclassify the ASM Role

On May 17, 2021, Kerska presented the RFD strategic plan for 2021-2040 to

the city council.  Under the plan, the ASM position was to remain as part of the

organizational structure. (Doc. 68-62 at 10.)  The city council voted and approved

of the plan.  (Id.)

Soon after, Kerska, Swisher, HR Representative Jennifer Simpson, and

Battalion Chief Holly Mulholland met to discuss the restructuring of the

administration department and Pronk's role as the ASM.  (Simpson Dep. 30:09-

32:06; Doc. 68-47.)  Because Kerska believed that the ASM responsibilities were

not being adequately fulfilled by Pronk, Kerska needed to decide whether to

"hold [Pronk] accountable to the job description as it was written" or "redesign

the job to what he [was] doing and able to do or willing to do." (Kerska Dep.

100:12-104:02.)

According to the reclassification policy written by Simpson,

A supervisor may make a request for a position reclassification to
the Director of Human Resources or designee.  This request will
include the current position description and a narrative describing
the substantial change(s) to the position duties and responsibilities.
For the purpose of evaluation "substantial change: to position duties
and responsibilities, a 40 percent change threshold is used; in other
words, the request for reclassification must demonstrate that
position duties and responsibilities have changed by at least 40
percent.

(Doc. 68-32; see also Simpson Dep. 97:04-14.)  Although unsure if the job would

change by 40 percent, Kerska decided to reclassify the ASM position. (Kerska

Dep. 100:12-104:02.)

### 2.   Removal of Supervisory responsibilities

Sometime before Kerska made this decision, Swisher reassigned

supervision of the administrative assistants over to himself and told Kerska of

the change.  (Swisher Dep. 35:7-37:18, 133:21-134:08; Kerska Dep. 30:16-31:23,

75:10-22.)  Linda Hillenbrand notified the RPEA of the change on June 15, 2021.

(Doc. 68-56 at 2.)

### 3.   Pronk's 2021 Annual Review

In July 2021, in preparation for Pronk's 2021 Annual Review, Swisher

asked Pronk to document areas of improvement in response to the 2020

Alternative Review.  (Doc. 68-43 at 1.)  Pronk replied to each of the issues

highlighted in the 2020 Alternative Review.  (Id.)  He also challenged statements

within the review such as "Curt places his personal judgment on items that he has no understanding of, frustrating staff, such as Station issues and Station purchases" and "bluffing or making up answers." (Id. at 4.)

On July 20, 2021, Pronk discussed his 2021 Annual Review with Swisher, Kerska, and Simpson.  (Pronk Dep. 111:05-112:05.)  The conversation focused on the criticisms noted in the 2020 Alternative Review.  (Id. 112:13-114:25.)  Pronk felt that these criticisms were based on his age but did not mention this to the group.  (Id. 115:02-07.)  Pronk's 2021 Annual Review rated Pronk's performance as unsatisfactory.  (Doc. 68-22.)

### 4.   Reclassifying the ASM Role

During the annual review meeting, Kerska also discussed changing Pronk's role within the organization and that a pay decrease could follow. (Pronk Dep. 115:08-12.)  Pronk was given the opportunity to provide input to the changes in his job.  (Id. at 115:16-120:07.)  Before providing his input, Pronk exchanged his thoughts with Swisher via email.  (Doc. 67-1 at 1.)  Early in the process, Pronk provided minimal suggestions to the reclassification of his role. (Id.)  In response to this approach, Swisher stated:

> Reading your response, I am under the impression you believe you could be successful in meeting the position requirements of your current job description with a minimum amount of changes.

11

> I am sorry to be blunt, but you have not been successful previously and I don't think you would be successful moving forward with the amount of scrutiny that we are placing on all positions to maximize the efficiency and effectiveness of our current resources.
>
> If you believe you would be successful with a minimum amount of changes to you[r] current job description, I would ask that you include what changes you plan to implement that would make you successful under each bullet of the job description.

(Id. at 2.) After a few other email exchanges, Pronk sent his input to Simpson who was put in charge of reclassifying Pronk's role. (Id.) Simpson, however, did not consider this input because she considered it untimely. (Simpson Dep. 71:15-75:16.) Simpson sent the new job description to a third-party evaluator to determine the pay equity structure as set by the City. (Id. 76:04-77:02.) Based on the job description changes "[f]ormal prep, decision making, interaction and communications" responsibilities were reduced. (Id. 86:10-13.)

On July 29, 2021, the RPEA union representative emailed Hillenbrand about reclassifying Pronk's position and concerns regarding timely feedback for its members. (Doc. 68-57.) On August 2, 2021, the evaluation of the newly created Administrative Service Specialist revealed that Pronk's position dropped from a Grade 6 to a Grade 4 resulting in a salary decrease from $128,086 to $116,213 annually. (Doc. 68-48; Simpson Dep. 78:11-16.)

12

On August 9, 2021, Swisher wrote a memo to Pronk detailing out the revision and expectations of the new role.  (Doc. 68-21 at 3-6.)  This memo was intended to provide "the broad essential duties listed in [the] job description," but "not intended to replace the job description." (Id.)  Based on these changes, Pronk retained his role in leadership committees and boards but was removed from the command staff meetings that involved the chief, deputy chief, assistant chief, and battalion chiefs. (Kerska Dep. 111:23-112:01; Swisher Dep. 172:15-173:14; Doc 68-49.)

### 5.  Pronk's Retirement

On August 18, 2021, Pronk emailed Hillenbrand about his intent to retire on August 31, 2021. (Docs. 59-3, 59-4.)  Pronk was 60 years old at the time.  After Pronk's retirement, the RFD changed the Administrative Services Specialist position into the Administrative Service Coordinator.  (Doc. 68-26.)  This role retained most of the responsibilities of the Administrative Service Specialist but included some additional duties and supervisory responsibilities.  (Simpson Dep. 86:21-89:02; Doc. 68-26.)  This role also maintained a grade 6 like that of the ASM position.  (Doc. 68-26.)  Another individual, age 50, was hired for the role. (Simpson Dep. 88:24-89:02.)

13

## I.    This Lawsuit

On December 14, 2022, Pronk sued Defendants, alleging Defendants Kerska, Swisher, and Hillenbrand unlawfully discriminated against Pronk in violation of the Age Discrimination in Employment Act of 1967 ("ADEA"), 29 U.S.C. § 621 et seq. (Count I); the Minnesota Human Rights Act ("MHRA"), Minn. Stat. §§ 363A.01-44 (Count II); and the Fourteenth Amendment's Equal Protection Clause through 42 U.S.C. § 1983 (Count III).  (Doc. 31 ¶¶ 49-53.) Pronk also alleged that Defendants Kerska, Swisher, and Hillenbrand deprived him due process (Count IV) and conspired with each other to deprive him of his constitutional right to equal protection because of his age and to deprive him of due process of the law and his property interest in his job (Count V).  (Id. ¶¶ 54-57.)  And, Pronk alleged that the City engaged in a custom, policy, and practice that led to a violation of the Equal Protection Clause and Due Process Clause of the United States Constitution (Count VI).  (Id. ¶ 58.)

## III.   DISCUSSION

### A.    Summary Judgment Standard

Summary judgment is appropriate if, viewing all facts in the light most favorable to the non-moving party, there is no genuine dispute as to any material fact, and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ.

P. 56(a); Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). The party seeking

summary judgment bears the burden of showing that there is no disputed issue

of material fact. Celotex, 477 U.S. at 323. "A dispute is genuine if the evidence is

such that it could cause a reasonable jury to return a verdict for either party; a

fact is material if its resolution affects the outcome of the case." Amini v. City of

Minneapolis, 643 F.3d 1068, 1074 (8th Cir. 2011) (citing Anderson v. Liberty

Lobby, Inc., 477 U.S. 242, 248, 252 (1986)).

A party asserting a fact is disputed must cite to "particular parts of

materials in the record." Neylon v. BNSF Ry. Co., 968 F.3d 724, 730 (8th Cir.

2020) (citing Fed. R. Civ. P. 56(c)(1)(A) and noting that plaintiff failed to cite

evidence supporting his statement). "The nonmoving party's allegations must

be supported by "sufficient probative evidence that would permit a finding in

his favor on more than mere speculation, conjecture, or fantasy." Mann

v. Yarnell, 497 F.3d 822, 825 (8th Cir. 2007) (cleaned up) (quotation omitted).

### B.    ADEA, MHRA, and Equal Protection Claims

Pronk alleges that Defendants Kerska, Swisher, and Hillenbrand

unlawfully discriminated against him because of his age in violation of the

ADEA, MHRA, and Equal Protection Clause of the Constitution. These age

discrimination claims are discussed together because they are analyzed under

the same evidentiary framework.  See Aulick v. Skybridge Americas, Inc., 860

F.3d 613, 620 (8th Cir. 2017); see also Hager v. Arkansas Dep't of Health, 735 F.3d

1009, 1014 (8th Cir. 2013).

"To establish a claim of intentional age discrimination, a plaintiff may

present direct evidence of such discrimination or may prove his claim through

circumstantial evidence."  Aulick, 860 F.3d at 620 (citation omitted).  If a plaintiff

offers only circumstantial evidence of age discrimination, as Pronk does here, the

Court applies the McDonnell Douglas burden-shifting analysis.  See McDonnell

Douglas Corp. v. Green, 411 U.S. 792, 800-04 (1973).

Under McDonnell Douglas, the plaintiff must first establish a prima facie

case of discrimination.  Id.  If the plaintiff succeeds, the employer must articulate

a legitimate, nondiscriminatory reason for the adverse employment action.  Id.  If

the employer meets this burden, then the plaintiff must prove by a

preponderance of the evidence that the legitimate reasons offered by the

defendant were not its true reasons but were pretext for discrimination.  Id.

Pronk must also establish that age was the "but-for" cause of his

constructive discharge.  See Gross v. FBL Fin. Servs., Inc., 557 U.S. 167, 177 (2009).

The ultimate question is whether Defendants "intentionally discriminated, and

16

the ultimate burden of proving intentional discrimination remains with" Pronk.

Tatom v. Georgia-Pac. Corp., 228 F.3d 926, 931 (8th Cir. 2000) (citations omitted).

### 1.    Prima Facie Case

To establish a prima facie case, Pronk must show: (1) he was a member of a

protected group, i.e., at least 40 years of age, (2) he was qualified for his position,

(3) that he was constructively discharged, and (4) he was replaced by a someone

sufficiently younger to permit the inference of age discrimination.  Tatom, 228

F.3d at 931(citations omitted); Aulick, 860 F.3d at 621 (citation omitted).  The

burden of establishing a prima facie case is not meant to be onerous.  Diesing v.

Best Buy Corp., No. 05-cv-2540 MJD/RLE, 2007 WL 2601076, at *5 (D. Minn. Sept.

10, 2007) (citing Texas Dep't of Comm. Affs. v. Burdine, 450 U.S. 248, 253 (1981)).

Here, Pronk fails to establish a prima facie case of age discrimination

because Pronk cannot prove he was constructively discharged.

### a.  Constructive Discharge

Constructive discharge occurs when an "employer deliberately create[s]

intolerable working conditions with the intention of forcing" an employee to

quit.  Blake v. MJ Optical, Inc., 870 F.3d 820, 826 (8th Cir. 2017) (quotation

omitted).  Establishing a claim for constructive discharge is a "substantial

burden."  Id.  "The intolerability of working conditions is judged by an objective

standard, not the employee's subjective feelings; the question is whether working conditions were rendered so objectionable that a reasonable person would have deemed resignation the only plausible alternative." <u>Tatom</u>, 228 F.3d at 932 (citations omitted).

Moreover, "[t]he employer's actions must have been intended to force the employee to quit." <u>Allen v. Bridgestone/Firestone, Inc.</u>, 81 F.3d 793, 796 (8th Cir. 1996). A plaintiff can satisfy the intent requirement by showing that his resignation was a reasonably foreseeable consequence of his employer's discriminatory actions. <u>Id.</u> The plaintiff must also give his employer "a reasonable opportunity to resolve a problem before quitting." <u>Sanders v. Lee Cnty. Sch. Dist. No. 1</u>, 669 F.3d 888, 893 (8th Cir. 2012); <u>see also</u> <u>Blake</u>, 870 F.3d at 826.

Defendants contend that a reasonable person would not have found Pronk's working conditions intolerable because "Pronk's working conditions were unremarkable." (Doc. 50 at 21.) Defendants also argue it was not foreseeable that Pronk would retire because the reclassification was meant to improve his working conditions and ensure he would be successful. (<u>Id.</u>)

18

To prove that his working conditions were intolerable, Pronk argues that he was not "afforded an opportunity to correct perceived deficiencies affecting his performance as ASM through a performance improvement plan." (Doc. 66 at 34.) Instead, Defendants characterized him as "lacking initiative [and] struggling to understand basic tasks." (Id. at 35.) The City then failed to follow its own reclassification policy, which resulted in a two-level grade decrease, removal of supervisory duties, a decreased annual pay of $11,873, and changes in Pronk's responsibilities. (Id. at 36.) Pronk argues that not putting him on a performance improvement plan signified an "intent to place him in an intolerable predicament leading to his resignation and constructive discharge." (Id.)

### i.    Working Conditions

The criticism of Pronk's work, removal of supervisory duties, and reduction in pay did not make Pronk's work conditions objectively intolerable. See Tatom, 228 F.3d at 932 (loss of supervisory responsibilities, a feeling of being unfairly criticized, dissatisfaction with work assignments, and loss of pay are insufficient to constitute a constructive discharge). While it may have been unpleasant to Pronk, the criticisms and feedback provided by Swisher from an objective point of view were not intolerable—especially when taken in full

19

context.  See Spears v. Missouri Dep't of Corr. & Hum. Res., 210 F.3d 850, 855

(8th Cir. 2000) (criticism and reprimand of plaintiff did not create intolerable

working conditions).

For example, Pronk points to Swisher's email in response to Pronk's initial

suggestions for the changes in his role.  (Doc. 67-1 at 1.)  Pronk felt that "Swisher

set him up to fail and whatever he put forward would not be good enough."

(Doc. 66 at 22.)  From an objective point of view, Swisher was "blunt" when

stating that he did not believe Pronk would be successful, but still allowed Pronk

an opportunity to explain how he could be successful moving forward. (See Doc.

67-1 at 1.)

Furthermore, while changes in his job description and loss of supervisory

responsibilities may have been difficult, it is insufficient to show that a

"reasonable person in [Pronk's] position would find it demeaning and

intolerable" as the changes were made with consideration of Pronk's strengths.

See Spann v. Neighbors Credit Union, No. 4:21-CV-405-MTS, 2022 WL 3368540,

at *5 (E.D. Mo. Aug. 16, 2022) (quotation omitted) (plaintiff failed to prove

constructive discharge where the record showed that instead of terminating

plaintiff's employment because of her inability to hold a management position,

defendant retained plaintiff and offered her a position that best suited her strengths). Moreover, the record reflects that Pronk was at best indifferent about his supervisory duties. (See, e.g., Pronk Dep. 22:11-23:08 (Pronk stating that he had "managed peopled for a number of years" and "just got tired of it."))

Finally, while the Court can appreciate that a decreased annual pay of $11,873 could be significant, "a reduction in pay does not necessarily constitute a constructive discharge." Allen, 81 F.3d 793, 797. Pronk does not allege or argue that the decrease in pay was significant in a way that a reasonable person in his shoes would find the working conditions intolerable. See Parrish v. Immanuel Med. Ctr., 92 F.3d 727, 732 (8th Cir. 1996) (evidence existed that employer knew that shifting an employee's work hours would make her feel uncomfortable).

## ii.    Foreseeability

Pronk's argument that Defendants could foresee his resignation are speculative at best. See Spann, 2022 WL 3368540, at *5. The record lacks any evidence that Defendants foresaw or intended for Pronk to retire from the RFD. Kerska testified that he believed that they "found a way for [Pronk] to be successful and continue to serve the fire department" and when Pronk decided to retire that it "took [him] by surprise." (Kerska Dep. 81:08-81:25.) Swisher

21

testified that he believed the same and that he was also surprised when Pronk decided to retire.  (Swisher Dep. 176:05-177:07.)  The policy statement that Pronk points to also states that "supervisors may consider the use of a . . . 'Performance Improvement Plan'" and not that they are required to.  (Doc. 68-30.)

Moreover, assuming Pronk's argument that the policy was violated, it is unclear why Defendants would have gone through the trouble of breaking city policy and redesigning Pronk's position if they intended for him to resign, much less how any of these actions related to Pronk's age.  As such, Pronk fails to establish that his retirement was a foreseeable consequence of Defendants' actions.

### iii.    Reasonable Opportunity

Finally, even if Defendants created intolerable working conditions and intended for Pronk to resign, Pronk failed to provide a reasonable opportunity for Defendants to address his discrimination concerns.[2]  When Pronk met with

---

[2] A disparate-treatment-based constructive discharge under the MHRA deviates from this requirement.  Under Minnesota law, a plaintiff "alleging disparate-treatment-based constructive discharge [is not required to] notify their employers of the intolerable conditions or otherwise attempt to mitigate the alleged mistreatment before resigning." Henry v. Indep. Sch. Dist. #625, 988 N.W.2d 868, 887 (Minn. 2023). Nevertheless, Pronk's MHRA claim still fails to

Swisher, Kerska, and Simpson on July 20, 2021, to discuss the ASM role, Pronk

did not mention his working conditions or any perceived age-discrimination.

(Pronk Dep. 115:02-07.)  Additionally, when the RPEA union representative

contacted Hillenbrand with concerns regarding the changes to Pronk's role, he

did not mention Pronk's working conditions nor that Pronk mentioned any

perceived age-discrimination issues.  (Doc. 68-57.)  Thus, Pronk failed to provide

Defendants with a reasonable opportunity to address any perceived age-

discrimination.

### 2.    Pretext

Even if Pronk could make a prima facie case of age discrimination, he

cannot prove that the Defendants' reason for reclassifying his position was

pretext for age discrimination.  It is undisputed that Defendants have offered a

"legitimate, nondiscriminatory reason" for reclassifying the ASM role.  See

McDonnell Douglas, 411 U.S. at 800-04.  Thus, the burden shifts back to Pronk to

show that this reason was not true and simply pretext for discrimination.  Id.

At this stage, a plaintiff "must present evidence, that considered in its

entirety (1) creates a fact issue as to whether the defendant's proffered reasons

_____

establish that his working conditions were objectively intolerable or that his
resignation was foreseeable.

are pretextual and (2) creates a reasonable inference that age was a determinative factor in the adverse employment decision." <u>Tusing v. Des Moines Indep. Cmty. Sch. Dist.</u>, 639 F.3d 507, 516 (8th Cir. 2011) (internal quotation marks omitted). A pretext inquiry "is limited to whether the employer gave an honest explanation of its behavior, not whether its action was wise, fair, or correct." <u>McKay v. U.S. Dep't of Transp.</u>, 340 F.3d 695, 700 (8th Cir. 2003).

The methods that a plaintiff may use to demonstrate pretext include: (1) demonstrating that the proffered reason has no basis in fact, (2) demonstrating that the action the employer took was contrary to a policy or practice, (3) showing that it is unlikely that the employer would have acted on the proffered reason, or (4) providing evidence of a discriminatory attitude in the workplace. <u>Erickson v. Farmland Indus., Inc.</u>, 271 F.3d 718, 727 (8th Cir. 2001).

### a. Basis In Fact

First, Pronk contends that Defendants' claim that Pronk was not fully performing his duties has no basis in fact. (Doc. 66 at 47.) Pronk points to the good performance reviews that he received over the years. (<u>Id.</u>) Pronk also argues that the reclassification of the Administrative Service Specialist to Administrative Service Coordinator after Pronk's retirement is an indication that Pronk's reclassification was a demotion intended to induce his resignation. (<u>Id.</u>)

Defendants respond that it would be improper for the Court to weigh the credibility of Pronk's past performance evaluations with his more recent evaluation. (Doc. 73 at 11.) Instead, Defendants provide that "'[a]n employer may choose to rely on recent performance more heavily than past performance,' and plaintiff's 'earlier performance reviews do not tend to prove' the employer's more recent performance reviews were pretextual." (Id. (quoting Erickson, 271 F.3d at 729).)

Pronk's arguments are unpersuasive because he fails to point to sufficient evidence in the record that would permit a finding in his favor. Pronk's reliance on the past performance reviews are misguided because "plaintiff's 'earlier performance reviews do not tend to prove' the employer's more recent performance reviews were pretextual." Erickson, 271 F.3d at 729. Moreover, he lacks any legal support to show that reclassification of a job position after an individual's resignation would show pretext for age discrimination.

Pronk also argues that Defendants constantly shifted him between the RPEA and RSA to create confusion in his union representation. This appears to be contradicted by the record as the RPEA began representing Pronk in discussions with Defendants shortly before his retirement. (See Doc. 68-57.)

25

### b. Policy and Practice

Second, Pronk argues that Defendants' policy violations show pretext.

Pronk argues that Defendants violated RFD's policies here in several different

ways: (1) Kerska failed to assess whether the ASM duties and responsibilities

were to be changed by 40 percent before reclassifying the position; (2) Kerska

decided to reclassify Pronk's position rather than putting Pronk on a

performance improvement plan; (3) the City failed to include Pronk's duties,

responsibilities, and job requirements under Pronk's job description; (4) the RFD

delayed Pronk's performance reviews; and (5) Kerska failed to submit the job

reclassification to the unions or city council. (Doc. 66 at 48-51.)

Here, Pronk fails to point to evidence in the record to show that

Defendants violated City policy or that any alleged violations showed pretext.

First, while Kerska admitted that he did not determine if Pronk's position

changed by 40 percent before reclassifying the ASM position, Simpson, the

individual who wrote the policy for reclassifying a position, found it to be

sufficient to continue with the process. (Simpson Dep. 97:04-14.) Even if it were

true, Defendants were entitled not to follow this policy. Edwards v. Hiland

Roberts Dairy, Co., 860 F.3d 1121, 1126-27 (8th Cir. 2017) (holding that "an

employer can certainly choose how to run its business, including not to follow its

own personnel policies regarding termination of an employee as long as it does not unlawfully discriminate in doing so") (quotation omitted and cleaned up).

Second, as previously explained, Kerska was also not required to put Pronk on a performance improvement plan before reclassifying the ASM position. Third, while performance reviews were delayed, it is also undisputed that this may have been a common problem and not specific to Pronk. (See Doc. 68-57.) Finally, Pronk provides no evidence that reclassification of the ASM position required city council approval.

### c. Stereotyping as Pretext

Third, Pronk argues that Swisher's demeanor and comments, in addition to encouraging staff to make complaints against Pronk, were evidence of age-based stereotyping. (Doc. 66 at 51-53.) Pronk also claims that Kerska calling him "Richard," slang for dick, was also evidence of age discrimination. (Id.) Defendants avers that none of the comments or actions taken were "correlated with age, much less age-based animus." (Doc. 73 at 13.)

Pronk fails to point to any age-based stereotyping within the record. The comments he points to are common criticisms that could be applied to anyone. For example, Pronk points to Swisher's comments that Pronk "struggles with the basic understanding of standard administrative tasks" and is "not respected," or

27

claims that Pronk was "bluffing and making up answers." (Doc. 66 at 51.) Pronk

contends that these comments reflected age-related bias but fails to explain how

age is correlated in any way.

Similarly, Pronk's claims that Kerska condoned disrespect of Pronk

through the "Richard" comments is unpersuasive. The testimony from both

Kerska and Swisher contradict this position and characterize this as an inside

joke between Kerska and Pronk. Pronk seemingly concedes this as he believed

Kerska used "this greeting with other male friends." (Doc. 68-78 at 4.)

Moreover, even if a jury found Pronk's characterization of the "Richard"

comments to be true, it is unclear how the comments are age related. Pronk

therefore fails to establish any stereotyping by Defendants.

### d. Shifting Reason

Finally, Pronk argues that Defendants provided shifting reasons for

reclassifying Pronk's position by first stating that they decided to reclassify

Pronk's position because he was being paid for duties he was not performing

and then stating that they were reclassifying his job so that Pronk could be

successful. (Doc. 66 at 53.) Defendants respond that this was not a shifting-

reason as these reasons can exist at the same time. (Doc. 73 at 14-15.)

"Not every supplement to an employer's initial statement of reasons gives rise to an inference of pretext, but substantial variations raise suspicion." <u>Baker v. Silver Oak Senior Living Mgmt. Co., L.C.</u>, 581 F.3d 684, 689 (8th Cir. 2009). "A plaintiff must do more than identify discrepancies or inconsistencies in an employer's rationale for terminating the plaintiff to prove that the employer gave shifting explanations." <u>Fatemi v. White</u>, 775 F.3d 1022, 1048 (8th Cir. 2015). The change in explanation must be substantial. <u>Id.</u> If the employer provides "two completely different explanations," there is evidence of pretext. <u>E.E.O.C. v. Trans States Airlines, Inc.</u>, 462 F.3d 987, 995 (8th Cir. 2006) (collecting cases).

No reasonable juror could infer pretext from the facts of this case because Defendants' reason for reclassifying the ASM role did not substantially change and has been consistent. <u>Fatemi</u>, 775 F.3d at 1048.

### 3. But-For Cause

Pronk also fails to establish a "reasonable inference that age was a determinative factor in the adverse employment decision." <u>Tusing</u>, 639 F.3d at 516. The only inference of age discrimination in the record was that a younger individual was hired after Pronk retired. This is insufficient to establish that age was the "but-for" cause of Defendants' decision to reclassify Pronk's position. <u>See, e.g.</u>, <u>Carraher v. Target Corp.</u>, 503 F.3d 714, 719 (8th Cir.

29

2007) (noting that being "replaced by someone substantially younger

. . . possesses insufficient probative value to persuade a reasonable jury that

[plaintiff] was discriminated against"); Thomas v. Corwin, 483 F.3d 516, 529 (8th

Cir. 2007) (finding that plaintiff could not show the employer's reasons for her

termination were a pretext for age discrimination where the plaintiff's only

evidence was that she was replaced by someone younger).

### 4.    Conclusion

In summary, Pronk fails to establish a prima facie case of age

discrimination because he fails to show that he was constructively discharged.

The record lacks evidence that Defendants intended for him to resign and there

is no evidence that his working conditions were so intolerable that a reasonable

person would quit.

Even if Pronk could establish a prima facie case of age discrimination,

Pronk fails at the pretext stage because he cannot show that Defendants' reason

for reclassifying his position was simply pretext for discrimination and because

he lacks sufficient evidence to show that age was the "but-for" cause of his

discharge.  The Court therefore grants Defendants' Motion for Summary

Judgment on these claims.

### C.    Procedural Due Process Claim

Next, the Court considers Pronk's procedural due process claim.  "To establish a procedural due process violation, a plaintiff must demonstrate that he has a protected property or liberty interest at stake and that he was deprived of that interest without due process of law."  Hopkins v. Saunders, 199 F.3d 968, 975 (8th Cir. 1999) (citation omitted).

### 1.    Property Right

In this case, Pronk must prove that he was deprived of "a property right in continued employment without due process."  Correia v. Jones, 943 F.3d 845, 848 (8th Cir. 2019) (internal citation and quotation marks omitted.)  "Whether an employee's interest in [his] job rises to the level of a constitutionally protected property right is a question of state law."  Allen v. City of Pocahontas, Ark., 340 F.3d 551, 555 (8th Cir. 2003) (citing Bd. of Regents of State Colleges v. Roth, 408 U.S. 564, 577 (1972)).

Pronk argues that a contractual right existed through "the City's policies for performance management, reviews, job description, and reclassification." (Doc. 66 at 54.)  Many of these arguments merely repeat arguments previously stated or are irrelevant to the question of whether a property interest existed.

31

Pronk however points to one specific policy that merits further discussion here—the City's policy that requires that employees be terminated for just cause.

Defendants contend that these policies do not establish any property interest because Defendants did not explicitly give up their power to terminate an employee at-will. (Doc. 50 at 30.) Defendants also argue that they properly followed their policies on reclassification and that Pronk misapplies the applicable policies relevant here. (Id. at 36.)

Under Minnesota law, at-will employees do not have a protected property interest in their jobs. Rutherford v. Cnty. of Kandiyohi, 449 N.W.2d 457, 460 n.1 (Minn. Ct. App. 1989). A property interest can be created when written employment policies create unilateral contracts, requiring discharge from their jobs to be for just cause. Pine River State Bank v. Mettille, 333 N.W.2d 622, 626–27 (Minn. 1983). However, an employer's disclaimer of intent to form a contract in an employment policy will prevent it from being construed as such. Ewald v. Wal–Mart Stores, Inc., 139 F.3d 619, 622 (8th Cir. 1998).

According to Article 2 of the Collective Bargaining Agreement ("CBA") of the RPEA, "[e]mployees shall not be terminated except for just cause." (Doc. 68-55 at 6.) Additionally, the CBA incorporates the city's policy on disciplinary

action.  (Id.)  The CBA's termination for just cause is enough to establish a

property interest.  Somers v. City of Minneapolis, 245 F.3d 782, 785 (8th Cir. 2001)

("If a public employee may not be terminated except for good cause, that is a

property interest entitled to due process protection" (internal citation omitted)).

Moreover, the city policy defines at-will employees as those working in "in a

temporary, seasonal, limited part-time (under 14 hours per week), or in a

probationary period." (Doc. 68-33 at 2.)  This does not apply to Pronk.

Accordingly, Pronk had a property interest in his job at the RFD.

### 2.    Due Process

Next, Pronk must show that he was deprived of that interest without

sufficient notice and opportunity to present his objections.  Cleveland Bd. of

Educ. v. Loudermill, 470 U.S. 532, 542 (1985) (citing Mullane v. Central Hanover

Bank & Trust Co., 339 U.S. 306, 313 (1950)).

"The fundamental requirement of due process is the opportunity to be

heard at a meaningful time and in a meaningful manner."  Wooten v. Pleasant

Hope R–VI Sch. Dist., 270 F.3d 549, 551 (8th Cir. 2001) (quoting Mathews v.

Eldridge, 424 U.S. 319, 333 (1976) (internal quotation marks omitted)).  "The

nature of this constitutional guarantee is flexible, however, and varies with the

particular situation."  Id.  (citation omitted). "[A]n employee waives a procedural

due process claim by refusing to participate in post-termination administrative or grievance procedures made available by the state." Krentz v. Robertson, 228 F.3d 897, 904 (8th Cir. 2000) (citations omitted).

Pronk fails to show that he was deprived of this property interest without sufficient notice and opportunity. While Pronk contends that there was some confusion over whether the RSA or RPEA represented him at the time of his alleged constructive discharge, both unions have grievance policies that Pronk failed to follow. (Docs. 68-55 at 15-16; 77 at 14-15.)

Moreover, Pronk fails to show that he was constructively discharged. Thus, any procedural due process claims were waived when he retired and refused "to participate in post-termination administrative or grievance procedures." Krentz, 228 F.3d at 904. As such, Pronk cannot prove that Defendants deprived him of his property interest in his job without due process of the law. Accordingly, the Court grants Defendants' Motion for Summary Judgment on these claims.

### D.    Conspiracy Claim

"There can be no civil conspiracy without an underlying constitutional violation." Wolk v. City of Brooklyn Ctr., No. 23-2939, 2024 WL 3382826, at *3 (8th Cir. July 12, 2024) (citing Riddle v. Riepe, 866 F.3d 943, 949 (8th Cir. 2017)).

34

Specific facts must also show a "meeting of the minds" among the alleged

conspirators.  Murray v. Lene, 595 F.3d 868, 870 (8th Cir. 2010) (citations

omitted).

Here, Pronk fails to show an underlying constitutional violation and fails

to show a "meeting of the minds" between Kerska, Swisher, and Hillenbrand.

As such, Pronk's conspiracy claim fails.  Therefore, Defendants are entitled to

summary judgment on this claim.

### E.    Monell Claim

Local governing bodies, including counties, can be sued under § 1983 for

monetary, declaratory, or injunctive relief when an unconstitutional act has

resulted from local government policy, regulation, or custom.  Monell

v. Department Soc. Servs. City of New York, 436 U.S. 658, 690 (1978).  To

establish liability, a plaintiff must demonstrate that an "action pursuant to [an]

official municipal policy . . . caused a constitutional tort."  Id.

When bringing a § 1983 claim based on custom, a plaintiff must

demonstrate the "existence of a continuing, widespread, persistent pattern of

unconstitutional misconduct by the government entity's employees,"

"[d]eliberate indifference to or tacit authorization of such conduct by the

governmental entity's policymaking officials after notice to the officials of that

35

misconduct," and that "plaintiff was injured by acts pursuant to the governmental entity's custom."  Johnson v. Douglas Cnty. Med. Dep't, 725 F.3d 825, 828 (8th Cir. 2013) (citation omitted).  The claimant must show that a municipal or local governmental policy or custom was a "moving force behind the employee's alleged constitutional violation."  Id.

Pronk argues that the City had a "custom and practice of not following its policies for performance management, job descriptions, job reclassifications and annual performance reviews, and CBA, [which] facilitated Pronk's demotion . . . resulting in his constructive discharge."  (Doc. 66 at 57.)  Defendants contend that "Pronk does not allege any municipal policy or custom was the moving force behind his constitutional deprivation."  (Doc. 73 at 16.)

Pronk has failed to establish an underlying constitutional violation to sustain his Monell claims, which is dispositive on this claim.  Brockinton v. City of Sherwood, 503 F.3d 667, 674 (8th Cir. 2007) (finding no Monell liability because plaintiff failed to show unconstitutional county policy or custom and reasoning that this circuit "has consistently recognized a general rule that, in order for municipal liability to attach, individual liability first must be found on an underlying substantive claim") (citation omitted).

36

Pronk also lacks any evidence of this alleged "existence of a continuing, widespread, persistent pattern of unconstitutional misconduct by the government entity's employees." Johnson, 725 F.3d at 828. Therefore, the Court grants summary judgment against Pronk on the Monell claim.

## IV.    ORDER

Based upon the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that Defendants' Motion for Summary Judgment **[Doc. 48]** is **GRANTED**.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

Dated:  January 21, 2025                         s/Michael J. Davis
                                                 Michael J. Davis
                                                 United States District Court